UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FELICIA PRICE,                    )
                                  )
                Plaintiff,        )
                                  )
        v.                        )     No.  4:07CV2029 DJS
                                  )                    (FRB)
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
                Defendant.        )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge pursuant
to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

On January 13, 2005, plaintiff Felicia Price filed an
application for Supplemental Security Income (SSI) pursuant to
Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.;
and an application for Disability Insurance Benefits (DIB) pursuant
to Title II, 42 U.S.C. §§ 401, et seq., in which she claimed that
she became disabled and unable to work on July 9, 2004.  (Tr. 59-
61, 329-30.)  On initial consideration, the Social Security
Administration denied plaintiff's applications for benefits.  (Tr.
38, 39-44, 331.)  On April 2, 2007, a hearing was held before an
Administrative Law Judge (ALJ).  (Tr. 336-67.)  Plaintiff testified
and was represented by counsel.  A vocational expert also testified

at the hearing.  On April 24, 2007, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 11-22.)  On October 3, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 5-8.)  The ALJ's determination of April 24, 2007, thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Testimony of Plaintiff</u>

At the hearing on April 2, 2007, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-one years of age.  (Tr. 339.)  Plaintiff went to school through the tenth grade and never obtained a GED.  (Tr. 341.)  Plaintiff lives with her three teenage children and a friend in her friend's house. (Tr. 340.)

From March 1988 to June 1990, plaintiff worked as a cashier at a movie theater.  From July 1990 to May 1995, plaintiff worked as a cashier at a clothing store.  From May 1995 to May 1998, plaintiff worked as a film clerk at a photo warehouse.  From May 1997 to June 2000, plaintiff worked as a shuttle driver in the auto industry (Ford Motor Co.).  From June 2001 to July 2004, plaintiff worked as a supervisor in the auto industry.  (Tr. 100.) Plaintiff testified that she left this job because of her back condition.  (Tr. 344.)  From October 31 through November 15, 2004, plaintiff worked as a factory worker at Express Services, Inc. From November 30 to December 31, 2004, plaintiff worked as a clerk

at CPI Corp. (Tr. 94.) Plaintiff testified that she stopped working at this time because her doctor told her to no longer work. (Tr. 344.) Plaintiff testified that, because of her financial condition, she recently obtained work through a temporary agency for six to eight months at a call center at Maritz but that she quit the job one month prior to the hearing because her supervisor was displeased with plaintiff being gone from her position too much and because plaintiff could not take her medication while on the job. (Tr. 360-62.)

Plaintiff testified that she experiences constant pain in her lower back that radiates to her buttocks and down her left leg to her foot. (Tr. 354.) Plaintiff testified that she has been participating in physical therapy since 1998 and had back surgery in 2003. (Tr. 345.) Plaintiff testified that rehabilitation has not helped her condition. (Tr. 354.) Plaintiff testified that she previously had two injections administered to her spine which helped her condition for a limited time, but that she has not received any injections since leaving Ford because she no longer had medical insurance. (Tr. 346-47.) Plaintiff testified that a second surgery had been recommended but that the neurologist decided not to pursue the surgery inasmuch as it would not relieve plaintiff's pain. Plaintiff testified that she has been advised that only medication could help her condition. (Tr. 351, 354.)

Plaintiff testified that she has been prescribed multiple medications, including Oxycontin, Vicodin, Lortab, Naproxen, Tramadol, Eltrin, and Flexeril; and that she currently takes

Flexeril three to six times a day and Lortab six to eight times a day. (Tr. 347-48.) Plaintiff testified that she just keeps taking medication if it does not work initially. (Tr. 348.) Plaintiff testified that she also used Fentanyl patches in the past which helped, but that her doctor stopped prescribing them because of her other medication. (Tr. 359.) Plaintiff testified that her medication makes her drowsy and causes her to sleep a lot. (Tr. 355.) Plaintiff testified that she uses a TENS unit which eases the pain somewhat but does not eliminate it. Plaintiff testified that she also uses a machine that stimulates the muscles. (Tr. 350.) Plaintiff testified that her back feels better when she is lying down so she tries to lie down as much as possible. (Tr. 351.)

As to her exertional abilities, plaintiff testified that she tries not to lift anything and cannot lift a gallon. Plaintiff testified that she can be on her feet for half an hour to an hour before she must sit. Plaintiff testified that sitting causes greater discomfort than standing and that she usually lies down after being on her feet for a while. (Tr. 351-52.) Plaintiff testified that when she lies down, she lies on her right side with a pillow between her legs, or sometimes lies on her back with a pillow under her legs and a heating pad against her back. Plaintiff testified that she lies down for a total of twenty hours each day. (Tr. 353.)

Plaintiff testified that she has a torn rotator cuff on the left side as well as tendinitis. Plaintiff testified that she feels pain and numbness from the center of her back radiating to

the left, all the way to her fingers. (Tr. 355-56.) Plaintiff testified that surgery had not been discussed regarding this condition and that she currently attends therapy for it. Plaintiff testified that physical therapy causes her to experience more pain. Plaintiff testified that she cannot raise her left arm to shoulder level. (Tr. 356.)

Plaintiff testified that she experiences constant pain which affects her concentration, ability to focus and ability to pay attention. Plaintiff testified that she has difficulty with her memory but questioned whether that could be attributable to her medication. (Tr. 356-57.)

As to her daily activities, plaintiff testified that she goes to bed around 10:00 p.m. and sleeps for only two or three hours during the night. Plaintiff testified that her doctor has given her medication to help her sleep at night but that such medication has been ineffective. Plaintiff testified that she gets out of bed around 6:00 a.m. but then gets back into bed when her back begins to hurt. (Tr. 348.) Plaintiff testified that her children help her with most things such as household chores. Plaintiff testified that she does not cook, clean or do laundry. (Tr. 349.) Plaintiff testified that her children help her with personal care such as dressing, feeding, bathing, washing and combing her hair, tying her shoes, and getting her to the bathroom. (Tr. 349, 352.) Plaintiff testified that she leaves the house only to attend doctor's appointments and physical therapy sessions. Plaintiff testified that she cannot stand long enough to go to the

grocery store so her children do the shopping for her.  Plaintiff testified that she reads a lot while lying in bed.  Plaintiff testified that she does nothing recreational.  (Tr. 352.)

B.    Testimony of Vocational Expert

W. Glenn White, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Mr. White classified plaintiff's past work at Ford Motor Co. as light and skilled.  Mr. White classified plaintiff's past work as a film clerk as light and semi-skilled; and plaintiff's past work as an inspector as sedentary and unskilled.  (Tr. 364.)

The ALJ asked Mr. White to assume an individual of plaintiff's age, education and work experience and to further assume that the person could

> lift 10 pounds on occasion, and lesser amounts
> frequently, could stand and/or walk at least
> two hours in an eight hour workday, sit at
> least six; and could occasionally climb ramps
> and stairs; and occasionally balance, stoop,
> kneel, crouch, or crawl, could never climb
> ladders, ropes, or scaffolds, and should avoid
> reaching overhead with the, her, work that
> required reaching overhead with the left upper
> extremity; and . . . the person should avoid
> working at dangerous, unprotected heights and
> around dangerous, unprotected machinery; and
> probably avoid jobs that require concentrated
> exposure to vibration.

(Tr. 364.)

Mr. White testified that such a person could perform plaintiff's past work as an inspector and that 2,000 of such jobs at the sedentary level were available in the local or state economy.  (Tr. 364.)

The ALJ then asked Mr. White to further assume that such an individual would have an additional limitation in that she would require a sit/stand option at her discretion. Mr. White testified that the job of inspector would be precluded with such a requirement. (Tr. 365.)

The ALJ then asked Mr. White to assume an individual of plaintiff's age, education and work experience who would consistently miss more than two days of work each month due to medical reasons. Mr. White responded that competitive employment would be precluded. (Tr. 365.)

The ALJ then asked Mr. White to assume that the person could appear at work every day but, at least once a week, would be late, leave early or be away from her work station for an additional break period. Mr. White testified that such conditions would have the same preclusive effect. (Tr. 365.)

Finally, the ALJ asked Mr. White to consider plaintiff's testimony regarding her recent employment at a customer service call center where she would log off of her telephone and leave her work station. Mr. White testified that permitting an employee to engage in this work behavior would not be a usual accommodation. (Tr. 365.)

### III.  Medical Records

On February 25, 2003, plaintiff visited Dr. Daniel D. Kitchens upon referral from Dr. Leonard Lucas for evaluation of lower back pain with pain down the left leg. Plaintiff reported having experienced pain for five years but that the pain had

recently worsened with a stabbing, burning-like discomfort on a daily basis. Plaintiff reported the pain to worsen with standing and to be relieved somewhat when she lies down on her stomach. Plaintiff reported that previous treatment with injections and physical therapy provided limited relief. Plaintiff's medications were noted to include Duragesic patches,[1] Vicodin[2] and Norvasc.[3] (Tr. 233.) Motor examination revealed normal tone and plaintiff had full muscle strength of all muscle groups. (Tr. 234.) Sensory examination was intact. Plaintiff's gait was noted to be steady. Musculoskeletal examination showed normal bulk, tone, power, and range of motion about the neck, shoulders, elbows, wrists, hands, hips, knees, and feet. Pain was noted with range of motion of the back. No tenderness to palpation was noted about the back, neck, lower back, shoulders, arms, or legs. There was no pain on forward bending or extension of the lower back. Faber's maneuvers were negative bilaterally. Straight leg raising was negative on the right and produced pain on the left. Dr. Kitchens noted an MRI to show a large disc herniation to the left side at the L5-S1 level

---

[1]The Duragesic patch provides a continuous, systematic delivery of fentanyl, which is indicated in the management of chronic pain in patients who require continuous opioid analgesia for pain that cannot be maintained by lesser means. Physicians' Desk Reference 1573-75 (55th ed. 2001).

[2]Vicodin, also marketed under the brand name Norco, is a combination of hydrocodone and acetaminophen used to relieve moderate to severe pain. Medline Plus (last revised Oct. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

[3]Norvasc is indicated for the treatment of hypertension. Physicians' Desk Reference 2506 (55th ed. 2001).

with compression of the left S1 nerve root. (Tr. 234-35.) Upon consultation, it was determined that plaintiff would undergo surgery for left L5-S1 microdiskectomy. (Tr. 235.)

On March 3, 2003, Dr. Kitchens performed a left L5-S1 microdiskectomy in response to plaintiff's complaints of severe pain in her back radiating down her left leg. Plaintiff had been diagnosed with herniated nucleus pulposus left L5-S1 with left S1 radiculopathy. (Tr. 243.)

Plaintiff visited Dr. Kitchens on March 11, 2003, and reported her pain to have improved and that she no longer had severe pain down her left leg. Plaintiff reported some numbness into her left calf and foot. Neurologic examination was unchanged. Dr. Kitchens permitted plaintiff to return to work with sedentary restrictions and instructed plaintiff to return in one month for follow up. (Tr. 236.)

Plaintiff visited Dr. Kitchens on April 8, 2003, and reported her leg pain to have improved. Dr. Kitchens noted plaintiff's neurologic exam to be unchanged. Dr. Kitchens noted that, overall, plaintiff had progressed satisfactorily. It was determined that plaintiff would begin therapy. Plaintiff was instructed to follow up in two months. (Tr. 237.)

Plaintiff visited Dr. Kitchens on June 12, 2003, and reported that she could not complete physical therapy because she was unable to get off of work. Plaintiff reported that she recently developed some burning-type pain in the left leg and that she experienced back pain that seemed to be associated with weather

changes. Dr. Kitchens noted plaintiff's neurologic exam to be unchanged. Dr. Kitchens stressed the importance of physical therapy to plaintiff and prescribed additional therapy for back strengthening. Plaintiff was given a prescribed Ultracet[4] for discomfort. (Tr. 238.)

An MRI of the lumbar spine was obtained on July 1, 2003, in response to plaintiff's complaints of radiating back pain. It was noted that plaintiff had a prior history of L5-S1 diskectomy. The MRI showed post-surgical changes at L5-S1 with epidural enhancement consistent with epidural scarring. Degeneration and bulging of the L5-S1 disc was noted. No focal disc herniation or root compression was seen. A cyst-like lesion was noted at the lower pole of the right kidney. (Tr. 244-45.)

Plaintiff returned to Dr. Kitchens on July 2, 2003, and reported that she continued to have some pain in her left leg and that the pain was as it was prior to surgery. Dr. Kitchens noted plaintiff's neurologic exam to be without change. Dr. Kitchens noted the MRI to show no new disc herniation. Conservative management with steroid injections was recommended. (Tr. 239.)

On July 11, 2003, upon referral from Dr. Leonard Lucas, plaintiff visited Pain Management Specialist Dr. T.Z. Chen for evaluation. (Tr. 240-42.) Plaintiff reported to Dr. Chen that her back pain completely subsided for two months post-surgery but

---

[4]Ultracet is an opiate agonist used to relieve moderate to moderately severe pain. It is used only by people "who are expected to need medication to relieve pain around-the-clock for a long time." Medline Plus (last revised July 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html>.

returned in May 2003.  Plaintiff reported her pain to be located at the lower lumbosacral region with radiation to the left hip and left leg, associated with numbness, tingling and a burning sensation.  Plaintiff reported that she had been taking eight to ten tablets of Vicodin a day during the previous two months. Plaintiff reported that she had been administered several nerve blocks and given a Fentanyl patch prior to having surgery performed.  (Tr. 240.)  Review of systems showed plaintiff to complain of fatigue, unsteady gait, leg cramps, back pain, limitation of range of motion, nervousness, depression, anxiety, sleep disturbances, abdominal pain, and diarrhea.  (Tr. 240-41.) Physical examination showed the upper extremities to be within normal limits.  (Tr. 241.)  Deep tendon reflexes of the knee jerk and Achilles tendon reflex were symmetrically decreased in the lower extremities.  Pinprick sensation was essentially normal. Some decrease in pinprick sensation was noted along the lateral border of the left thigh.  With examination of the back, some tenderness was noted about the right sacroiliac joint.  Vertebral musculature of the cervical and lower lumbosacral region was noted to be slightly increased.  Upon conclusion of the examination, Dr. Chen diagnosed plaintiff with lumbar radiculopathy.  Dr. Chen recommended that plaintiff be administered lumbar epidural nerve blocks, be prescribed Fentanyl skin patches, continue with hydrocodone to take as needed for breakthrough pain, and to add

Pamelor to her medication regimen.  (Tr. 242.)  Fentanyl, Lortab[5] and Pamelor[6] were prescribed.  (Tr. 148.)

On July 25, 2003, plaintiff went to the emergency room at St. John's Mercy Medical Center complaining of dizziness and vomiting.  (Tr. 159.)  It was noted that plaintiff suffered from chronic back pain.  (Tr. 154.)  Plaintiff questioned whether she was experiencing an adverse reaction to medication recently prescribed.  (Tr. 152.)  Plaintiff was instructed to stop taking Nortriptyline (Pamelor).  (Tr. 151.)  Plaintiff was discharged that same date in improved and stable condition.  (Tr. 155.)

On January 3, 2004, plaintiff visited the emergency room at Christian Hospital complaining of an aching back and chest, with pain in her throat.  Plaintiff's current medication was noted to be Norvasc.  Plaintiff was discharged that same date with a diagnosis of upper respiratory infection.  (Tr. 157-63.)

A chest x-ray taken on February 26, 2004, was negative. (Tr. 246.)

An MRI of the cervical spine obtained on February 27, 2004, showed no evidence of focal disc protrusion or hypertrophic ridging.  No abnormal mass was identified.  (Tr. 247.)

On May 3, 2004, plaintiff visited the emergency room at

---

[5]Lortab is indicated for the relief of moderate to moderately severe pain.  <u>Physicians' Desk Reference</u> 3209-10 (55th ed. 2001).

[6]Pamelor (nortriptyline) is an antidepressant used to treat depression but may also be used to treat panic disorders and post-herpetic neuralgia.  <u>Medline Plus</u> (last revised Aug. 1, 2007)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/</u> a682620.html>.

Christian Hospital complaining of migraine headaches and dizziness. Plaintiff reported having intermittent headache episodes during the previous two and a half weeks. Plaintiff reported pain radiating down her left arm with migraines. Plaintiff's medical history was noted to include hypertension, migraines and sciatica. Plaintiff was given Demerol,[7] Vistaril,[8] Solu-Medrol,[9] and Toradol[10] in the emergency room. A CT scan of the head and brain yielded negative results. Upon discharge on May 4, 2004, plaintiff was given Prednisone and Motrin. (Tr. 164-76.)

Plaintiff went to the emergency room at Christian Hospital on September 2, 2004, complaining of back pain. It was noted that plaintiff suffered from chronic back pain but that she felt something "pop" the previous day while sitting. Plaintiff reported the current pain not to be similar to her chronic pain. Plaintiff reported the chronic pain to radiate to her left arm and left leg and that nothing relieved the pain. Plaintiff's current

---

[7]Demerol is indicated for the relief of moderate to severe pain. Physicians' Desk Reference 2851 (55th ed. 2001).

[8]Vistaril is used to relieve the itching caused by allergies, to control nausea and vomiting caused by various conditions, and for anxiety. Medline Plus (last reviewed Aug. 1, 2007) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html>.

[9]Solu-Medrol is a corticosteroid used to relieve inflammation. Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a601157.html>.

[10]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. Physicians' Desk Reference 2789-91 (55th ed. 2001).

medications were noted to include Lortab, Norvasc and Flexeril.[11]
Physical examination showed plaintiff to have full range of motion
of the back.  Muscle spasming was noted about the right upper back.
Plaintiff was diagnosed with muscle spasms and neck/back pain and
was given Norgesic Forte[12] upon discharge for muscle spasms.  (Tr.
177-87.)

On November 26, 2004, plaintiff was admitted to the
emergency room at Christian Hospital complaining that her left arm
felt out of place.  Plaintiff reported her arm to swell and feel
broken.  Plaintiff complained of neck pain and left scapular pain
and reported the pain to have begun three weeks prior.  Plaintiff's
history of back pain, intervertebral disk disease and hypertension
was noted.  Plaintiff's current medication was noted to include
Norvasc.  X-rays of the left shoulder and chest were negative.  An
x-ray of the thoracic spine showed mild scoliosis with degenerative
changes.  An x-ray of the cervical spine showed scoliosis with mild
straightening of the lordosis.  Upon examination, plaintiff was
diagnosed with cervical radiculopathy on the left and was given
Toradol.  Plaintiff was discharged that same date and was provided
a medical restriction excusing her from work for that date plus

_____

[11]Flexeril is a muscle relaxant used with rest, physical
therapy and other measures to relax muscles and relieve pain and
discomfort caused by strains, sprains and other muscle injuries.
Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a682514.html>.

[12]Norgesic Forte is indicated for the symptomatic relief of
mild to moderate pain of acute musculoskeletal disorders.
Physicians' Desk Reference 1806 (55th ed. 2001).

three additional days.  Upon discharge, plaintiff was given Soma[13] for muscle spasms and Vicodin for pain.  (Tr. 188-205.)

On November 29, 2004, plaintiff visited Dr. Lucas with complaints of pain in her left arm and left leg.  Plaintiff's recent visit to the emergency room was noted.  Plaintiff reported that she could not lift her left arm away from her body.  Pain was noted over the rotator cuff area.  Dr. Lucas determined to order an MRI of the left shoulder and cervical spine.  (Tr. 207.)

An MRI of the left shoulder obtained December 1, 2004, showed rotator cuff tendinitis.  Dr. Lucas determined for plaintiff to participate in physical therapy and to be administered a cortisone injection for the condition.  (Tr. 208-09.)

Plaintiff visited Dr. Lucas on December 14, 2004, for injection to the left shoulder.  Dr. Lucas noted plaintiff's medications to include Norco and Norvasc.  Physical examination of the left shoulder was consistent with rotator cuff tendinitis and plaintiff was diagnosed with such.  Plaintiff was administered the injection and was prescribed Voltaren.[14]  (Tr. 210.)

Plaintiff returned to Dr. Lucas on January 18, 2005, for follow up of her trigger point injection.  Plaintiff reported her condition to be as before and that Narco was not helping.  Dr.

---

[13]Soma (carisoprodol) is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 3252 (55th ed. 2001).

[14]Voltaren is used for the acute and chronic treatment of the signs and symptoms of rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis. Physicians' Desk Reference 2151-53 (55th ed. 2001).

Lucas questioned whether plaintiff had a rotator cuff tear although the MRI did not show a tear. Dr. Lucas instructed plaintiff to participate in physical therapy and opined that an orthopedic consult may be necessary if the condition did not improve. (Tr. 211, 249.)

On January 20, 2005, plaintiff visited St. John's Mercy Sports and Physical Therapy Center for evaluation of her shoulder. It was noted that a full evaluation could not be completed because of plaintiff's severe pain. Plaintiff rated her pain to be constantly at a level ten on a scale of one to ten and reported that the pain worsens when the weather changes, when air hits her arm, and when she lifts her arm. Plaintiff reported that she also experiences constant numbness and tingling in all of her fingers. Plaintiff reported that she received two cortisone injections with minimal relief. Therapist Brittany Berry noted plaintiff to have severe hypersensitivity to normal touch with respect to the left arm and that plaintiff was functionally limited in that she could not lift the left arm due to severe pain. Plaintiff was given instruction regarding a home exercise program and was instructed to participate in physical therapy two times per week for four weeks. (Tr. 212.)

On February 11, 2005, plaintiff contacted Dr. Lucas's office seeking medication for a sinus infection. No other complaints were noted. (Tr. 213.)

On April 7, 2005, plaintiff underwent a consultative medical examination at Forest Park Medical Clinic for Disability

Determinations. Plaintiff reported to Dr. Fedwa Khalifa that she suffered from a bulging disc and tendinitis of the rotator cuff. Plaintiff's medical history was noted. Plaintiff reported to Dr. Khalifa that she can walk for one block, stand for fifteen minutes, sit for fifteen minutes, and cannot lift any weight. Plaintiff reported that she can bend but with difficulty and can sit and watch television. Plaintiff reported that she sleeps for four hours before she wakes up in pain. Plaintiff reported that she does not do housework but can go to the grocery store where her children help her. Plaintiff reported that she occasionally cooks but generally does not. Plaintiff reported her current medications of Norco and Vicodin to ease the pain but not eliminate it. Dr. Khalifa noted plaintiff to also take Lortab and Norvasc. Plaintiff reported to Dr. Khalifa that her left shoulder pain radiates down the left arm and that she experiences numbness in the arm as well. Plaintiff reported the pain to be worse in the morning and to ease throughout the day. Plaintiff reported that she can occasionally manipulate her buttons but that she needs her children's help. Plaintiff reported that she suffers migraines twice a month on account of high blood pressure and that she suffered a mild stroke in the 1990's with no residual adverse effects. Physical examination of the back showed mild mid-back tenderness with no muscle spasm. Examination of the extremities showed them all to be within normal limits. Range of motion examination showed plaintiff to have limited range of motion about the left shoulder, left knee and hip, and lumbar spine. Straight leg raising was positive at

forty-five degrees in the supine position. Plaintiff could not stand on her heels or toes due to pain in the left leg. Plaintiff's gait was normal. Plaintiff had full strength and reflexes in all extremities, and sensory examination was intact. (Tr. 214-19.)

Plaintiff returned to Dr. Lucas on April 28, 2005, and complained of pain from her shoulder to her feet, traveling through her back. Plaintiff also complained of intermittent pain, numbness and tingling to the left hand. Dr. Lucas noted plaintiff to be taking Norvasc. Dr. Lucas diagnosed plaintiff with chronic low back pain and chronic left shoulder pain with history of tendinitis. Dr. Lucas ordered an MRI of the lumbosacral spine and prescribed Vicodin and Skelaxin.[15] (Tr. 250.)

On April 29, 2005, Dr. John A. Raabe, medical consultant for Disability Determinations, completed a Physical Residual Functional Capacity Assessment based on his review of the consultative examination. In this assessment, Dr. Raabe opined that plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds; could stand and/or walk at least two hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and had unlimited ability to push and pull. Dr. Raabe further opined that plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and

---

[15]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1080 (55th ed. 2001).

could never climb ladders, ropes or scaffolds. Dr. Raabe opined that plaintiff was limited in overhead reaching but was otherwise unlimited in her manipulative abilities. Dr. Raabe further opined that plaintiff had no visual, communicative or environmental limitations. (Tr. 220-27.)

An MRI of plaintiff's lumbar spine obtained May 3, 2005, showed broad, non-enhancing midline focal disc protrusion at L5-S1 abutting against transversing nerve root sleeves. (Tr. 261.)

On May 20, 2005, Dr. Lucas prescribed Vicodin for plaintiff. (Tr. 249.) On May 23, 2005, Vicodin and Skelaxin were prescribed. (Tr. 249.)

On June 1, 2005, plaintiff returned to Dr. Lucas and complained of severe pain. Plaintiff reported that she could not get out of bed or walk. It was noted that a neurosurgeon reviewed plaintiff's records but refused to see plaintiff without an MRI of the cervical spine. Physical examination showed muscle spasms on the left and limited flexion. Grip strength was noted to be 3/5 on the left and 5/5 on the right. Dr. Lucas diagnosed plaintiff with lumbar ruptured disc, neck pain radiating down the left arm, and left arm weakness. Dr. Lucas determined to order an MRI of the cervical spine and refilled plaintiff's prescriptions for Vicodin and Skelaxin. (Tr. 252.)

An MRI of the cervical spine obtained on June 8, 2005, yielded negative results. (Tr. 262.)

Plaintiff returned to Dr. Lucas on June 21, 2005, and reported that the Skelaxin was helping the numbness in her left

hand.  Plaintiff continued to complain of back pain and reported that she had not participated in physical therapy inasmuch as she was told to cancel therapy if she was in pain.  Range of motion exercises elicited pain in the posterior shoulder and scapula.  Dr. Lucas noted the MRI of the cervical spine to be normal.  Plaintiff was diagnosed with left shoulder pain with radiculopathy to the left arm.  Plaintiff was instructed to participate in physical therapy for her shoulder and cervical traction was ordered.  (Tr. 253.)

An x-ray of plaintiff's lumbar spine obtained at Christian Hospital on August 8, 2005, was normal.  (Tr. 264.)

Plaintiff returned to Dr. Lucas on September 12, 2005, and complained of increased pain in her neck.  Plaintiff reported that about thirty days prior she could not feel or move her legs for a twelve-hour period and went to the emergency room for care. Dr. Lucas noted plaintiff to have limited flexion of her back. Plaintiff reported that she took eight to ten Vicodin when she experienced increased pain.  Dr. Lucas diagnosed plaintiff with lumbar disc disease and sciatica.  Plaintiff was prescribed Lortab and was instructed to undergo evaluation for physical therapy treatment.  (Tr. 254.)

On September 20, 2005, plaintiff complained to Dr. Lucas that her legs hurt more.  Plaintiff reported that she experienced more difficulties with her legs after one day of work at a fairly sedentary job.  It was noted that plaintiff had a brace.  Dr. Lucas noted an MRI to show a ruptured disc.  Dr. Lucas continued in his

diagnoses and plaintiff was instructed to increase her dosage of Neurontin.[16]  Zanaflex[17] was also prescribed.  (Tr. 255.)  On that same date, Dr. Lucas's office completed a "Disability Certificate" for plaintiff's employment wherein Dr. Lucas reported that plaintiff was "unable to work indefinitely."  (Tr. 327.)

Plaintiff was admitted to the emergency room at Christian Hospital on November 23, 2005, complaining of back pain.  Plaintiff reported the pain to radiate to her legs and that it felt as though bricks were holding her legs down.  Plaintiff also reported weakness in her legs and that she was unable to get around at home due to leg weakness.  It was noted that plaintiff moved her legs well although she reported them to feel heavy.  Strong pedal pulses were noted.  No swelling was noted.  Plaintiff had normal range of motion of all extremities and there was no tenderness to the extremities upon palpation.  Motor and sensory examinations showed no deficit.  Straight leg raising was positive bilaterally.  Power was noted to be 4/5.  Injections of Valium[18] and Dilaudid[19] were

---

[16]Neurontin is used to relieve the pain of post-herpetic neuralgia.  Medline Plus (last revised June 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a694007.html>.

[17]Zanaflex is a skeletal muscle relaxant used to relieve the spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury.  Medline Plus (last revised Jan. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121. html>.

[18]Valium is used to relieve anxiety, muscle spasms and seizures.  Medline Plus (last reviewed Aug. 1, 2007) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html>.

[19]Dilaudid is a strong analgesic injected to relieve pain.  Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a601148.html>.

given.  Plaintiff was diagnosed with lumbosacral radiculopathy and was discharged that same date.  Plaintiff was prescribed Percocet[20] and Prednisone upon discharge.  (Tr. 267-79.)

On January 5, 2006, plaintiff visited Dr. Lucas and complained of back pain.  Plaintiff reported that she experienced pain in her neck which radiated down the spine to her lower back and to her left leg, but that the pain was currently going down to both legs.  It was noted that plaintiff took Percocet and Skelaxin, but plaintiff reported that nothing helped.  Physical examination showed plaintiff to have diffuse tenderness along the entire back.  Plaintiff was diagnosed with exacerbation of chronic back pain.  MRI's of the cervical, thoracic and lumbar spines were ordered.  Plaintiff was instructed to continue with her current medications.  (Tr. 257.)

Plaintiff appeared at the emergency room at Christian Hospital on that same date and complained of an aching, throbbing pain beginning in the back of the neck and radiating to the buttocks, thighs and both legs.  Plaintiff rated the pain at a level eight on a scale of one to ten.  Plaintiff reported the pain to improve with sitting still.  Physical examination showed plaintiff to have a normal range of motion about the back.  Neurologic function and reflexes about the back were normal.  Weight bearing, gait and posture were normal.  X-rays of the

---

[20]Percocet contains oxycodone and acetaminophen and is used to relieve moderate to severe pain.  Medline Plus (last reviewed Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132. html>.

cervical spine were normal. Plaintiff was diagnosed with back sprain and neck strain and was administered an injection of Toradol. Flexeril was also given. Plaintiff was discharged that same date and was given a work note that plaintiff could return to work in one day with restrictions. Plaintiff was prescribed Naprosyn,[21] Skelaxin, Ultracet, and Prilosec upon discharge. (Tr. 280-96.)

On February 13, 2006, plaintiff appeared at the emergency room at Christian Hospital complaining of having a headache for two days, reporting that she felt the same way she did years ago when she had a stroke except with no numbness currently. It was noted that plaintiff had normal range of motion of all four extremities with no tenderness or edema. Motor and sensory examination was normal. Chest x-rays yielded normal results. A CT scan of the brain was normal. Plaintiff had a normal EKG. Plaintiff was given injections of Thorazine[22] and Zofran.[23] Plaintiff was diagnosed with a headache and was discharged that same date. (Tr. 297-323.)

---

[21]Naprosyn is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis. Medline Plus (last reviewed Aug. 1, 2007) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

[22]Thorazine is used to treat the symptoms of schizophrenia and other psychotic disorders, as well as to treat acute intermittent porphyria (a condition in which certain substances build up in the body and cause stomach pain, changes in thinking, and other symptoms) and tetanus (an infection causing tightening of the muscles). Medline Plus (last revised Nov. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682040.html>.

[23]Zofran is used to prevent nausea and vomiting. Medline Plus (last revised Jan. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a606022.html>.

On April 24, 2006, plaintiff's prescription for Norvasc was refilled. (Tr. 258.)

Plaintiff returned to Dr. Lucas on May 4, 2006, who noted plaintiff to be in pain. It was noted that plaintiff experienced pain in the mid-thoracic spine, buttocks, left leg, and left arm. It was noted that plaintiff had participated in physical therapy and reported that it was helping. Dr. Lucas continued in his diagnoses of lumbar disc disease and sciatica. Plaintiff was instructed to take Lortab for increased pain and to continue with Norvasc. Lyrica[24] was also prescribed. (Tr. 259.) On that same date, Dr. Lucas completed a "Disability Certificate" wherein he stated that plaintiff was "unable to work" and had diagnoses of lumbar disc disease and sciatica. (Tr. 327.)

On August 9, 2006, plaintiff reported to Dr. Lucas that while stretching she felt a pop in the upper posterior area of the left shoulder. Plaintiff reported that she was experiencing burning and throbbing in the area. Plaintiff reported that Lyrica had been helping prior to this. Physical examination showed guarding of the entire cervical and shoulder area. Dr. Lucas diagnosed plaintiff with strained cervical/shoulder and thoracic spine sprain. Plaintiff was prescribed Zanaflex and was instructed to continue with Lortab. Plaintiff was referred to physical therapy for evaluation of her neck. (Tr. 260.)

On January 2, 2007, plaintiff visited Dr. Lucas and

---

[24]Lyrica is used to relieve neuropathic pain and to treat fibromyalgia. <u>Medline Plus</u> (last revised June 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html>.

complained of back and arm pain.  It was noted that plaintiff was waiting for disability.  It was noted that plaintiff went back to work which involved sitting at a desk or table, but that she quit due to increased pain.  Plaintiff reported her pain to be at a level two to six when she was off of work, but that the pain increased to eight or nine while at work.  It was noted that plaintiff last visited a pain management specialist two years prior.  Plaintiff requested a cortisone injection.  Dr. Lucas diagnosed plaintiff with cervical lumbar disc disease and prescribed Lortab and Zanaflex.  (Tr. 325.)

On January 8, 2007, plaintiff reported to Dr. Lucas that there were work issues relating to her medications.  Plaintiff reported constant pain in her back and left shoulder and that such pain was at a level five or six at a minimum, increasing to a level eight or nine.  Dr. Lucas noted an MRI of the cervical spine to be normal and that plaintiff had left shoulder tendinitis of the rotator cuff.  Plaintiff had decreased range of motion of the left shoulder with pain.  Plaintiff was diagnosed with lumbar disc disease with ruptured disc and left shoulder rotator cuff tendinitis.  Medical disability was noted.  (Tr. 326.)  On that same date, Dr. Lucas's office completed a "Disability Certificate" wherein it was stated that plaintiff would be able to return to work duties in June 2007 and that she was restricted due to lumbar disc disease.  (Tr. 327.)

On March 30, 2007, SSM Rehab completed an "Employee Verification Form" wherein it was stated that plaintiff attended

physical therapy on seventeen occasions between January 10 and March 30, 2007. (Tr. 328.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the special earnings requirements of the Social Security Act since the alleged onset date of disability and continued to meet them through the date of the decision. Acknowledging evidence that plaintiff had numerous jobs since the alleged onset date of July 9, 2004, including as recently as March 2007, the ALJ stated that plaintiff "possibly" had not engaged in substantial gainful activity since July 9, 2004. The ALJ found plaintiff's status-post microdiskectomy, continuing degenerative disc disease of the lumbosacral spine, mild degenerative changes of the cervical and thoracic spine, and left shoulder tendinitis to be severe impairments but that such impairments, either singly or in combination, did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegations of symptoms precluding any sustained work activity not to be credible. The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform the physical exertional and nonexertional requirements of work except "probably" for prolonged or frequent standing or walking; lifting or carrying objects weighing more than 10 pounds; climbing of ropes, ladders or scaffolds, or more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; overhead reaching with the nondominant left upper extremity; or concentrated or excessive exposure to

vibrations or to unprotected heights or dangerous moving machinery. The ALJ found plaintiff unable to perform any past relevant work. Considering plaintiff's age, education, lack of transferable skills, and RFC to perform less than a full range of sedentary work, the ALJ found that plaintiff could perform other work, and specifically, inspector.[25] The ALJ determined that about 2,000 of such jobs existed in the St. Louis area. As such, the ALJ found plaintiff not to be under a disability at any time through the date of his decision. (Tr. 21-22.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age,

_____

[25]Although plaintiff worked as an inspector in 2005, the ALJ determined such work not to have been performed long enough to be considered past relevant work. (Tr. 16, 18.)

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);

Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely

- 29 -

because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ erred in his determination of plaintiff's RFC by according greater weight to the opinion of a non-examining physician than that of plaintiff's treating physician, and by failing to recontact plaintiff's treating physician for additional information regarding limitations caused by plaintiff's impairment. Plaintiff also contends that the ALJ erred in his adverse credibility determination. Finally, plaintiff argues that the ALJ improperly relied on the testimony of the vocational expert in finding plaintiff not to be disabled inasmuch as the hypothetical question posed to the expert was flawed in its reliance on the opinion of the non-examining physician. The undersigned will address each of plaintiff's contentions in turn.

A. <u>Weight Given to Physicians' Opinions</u>

Plaintiff claims that the ALJ erred in his RFC determination by according greater weight to the functional assessment completed by non-examining physician Dr. Raabe than to the opinion of plaintiff's treating physician, Dr. Lucas, without good reason.

The Regulations require the Commissioner to give more weight to the opinions of treating physicians than other sources. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A treating physician's

assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); <u>see also</u> <u>Forehand v. Barnhart</u>, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. <u>Wagner v. Astrue</u>, 499 F.3d 842, 849 (8th Cir. 2007); <u>Charles v. Barnhart</u>, 375 F.3d 777, 783 (8th Cir. 2004). The ALJ may discount or disregard such opinions if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. <u>Hogan v. Apfel</u>, 239 F.3d 958, 961 (8th Cir. 2001).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors

in determining what weight to accord the opinion, with such factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Inconsistency with other evidence alone is sufficient to discount a treating physician's opinion. Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005).

In his written decision, the ALJ recognized Dr. Lucas to be plaintiff's treating physician and noted the treatment provided by Dr. Lucas, including the prescription of pain medications, the administration of injections, and the ordering and reviewing of various diagnostic tests. Although Dr. Lucas provided plaintiff with off-work excuses in September 2005, May 2006 and January 2007, the ALJ noted the excuses to be for indefinite periods of time without indication as to any specific long-term limitations or to the permanency of any restrictions. The ALJ also noted that despite these work excuses, plaintiff engaged in significant work activity during these periods, including for an extensive period between July 2006 and March 2007. Indeed, the ALJ observed

plaintiff's time *off* of work during the relevant period to have been temporary.

The ALJ also summarized other evidence of record and determined it to be inconsistent with any perceived opinion that plaintiff was unable to work.[26]  Specifically, the ALJ noted that while x-rays and MRI's showed plaintiff to experience musculoskeletal impairments, they nevertheless demonstrated such conditions to be mild.  See, e.g., Owen v. Astrue, No. 08-1172, slip op. at 9 (8th Cir. Dec. 29, 2008).  The ALJ also noted that while the consultative examination in April 2005 showed plaintiff to have limited range of motion, plaintiff was nevertheless noted to have a normal gait, no loss of grip strength or of fine or gross motor movements, and no muscle weakness or neurological deficits.  It is the ALJ's duty to resolve conflicts in the medical evidence of record.  Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008); Wagner, 499 F.3d at 848.

Plaintiff claims that the ALJ "discard[ed] the opinion of [plaintiff's] treating physician" in this matter.  (Pltf.'s Brief at p. 8.)  Contrary to plaintiff's contention, the ALJ did not "discard" any opinion of Dr. Lucas, but instead detailed the ways in which a finding that plaintiff was unable to work was inconsistent with other medical evidence in the record.  See, e.g.,

_____

[26]In her Brief in Support of the Complaint, plaintiff repeatedly refers to the "opinion" of her treating physician, Dr. Lucas, but does not articulate what that opinion is.  A review of the record shows Dr. Lucas to have made cursory entries in his treatment notes and to have provided three work excuses to plaintiff on pre-printed forms.  The record reveals no other evidence which could constitute an opinion from Dr. Lucas.

<u>Finch</u>, 547 F.3d at 936-37.  The reasons provided by the ALJ are supported by substantial evidence and are sufficient to accord less than controlling weight to any opinion perceived by plaintiff to have been rendered by Dr. Lucas that plaintiff was unable to engage in work activity for a period of twelve months or longer.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); <u>Goff</u>, 421 F.3d at 790-91.  If two inconsistent positions may be drawn from the evidence and one of those positions represents the ALJ's findings, the Court must defer to those findings.  <u>Goff</u>, 421 F.3d at 789.

To the extent plaintiff claims the ALJ improperly accorded great weight to the opinion of non-examining physician Dr. Raabe, the undersigned notes it to be well settled that in determining the nature and severity of a claimant's impairment, "an ALJ may consider the opinion of an independent medical advisor as one factor[.]"  <u>Casey v. Astrue</u>, 503 F.3d 687, 697 (8th Cir. 2007) (internal quotation marks and citation omitted).  The weight given opinions of non-examining sources depends on the degree to which they provide supporting explanations.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); <u>Lauer v. Apfel</u>, 245 F.3d 700, 705 (8th Cir. 2001).

In this case, the ALJ did not rely solely on the opinion of Dr. Raabe in determining plaintiff's RFC but rather examined the entire record as a whole, including medical evidence from Dr. Kitchens, Dr. Chen, Dr. Lucas, Dr. Khalifa, and the various emergency room visits.  Upon consideration of all of the evidence, the ALJ determined plaintiff to have the RFC to perform certain work activities.  The ALJ recognized that the capabilities and

limitations identified in his RFC determination "were the ones more or less established by [the] State Agency medical evaluator[]," but noted that he also imposed additional restrictions based upon his review of the evidence as a whole. (Tr. 18-19.) Considering the findings made by non-examining physician Dr. Raabe as a factor in this RFC assessment was not error.

Finally, plaintiff argues that the ALJ should have recontacted Dr. Lucas to further develop the record as to plaintiff's level of functioning. An ALJ has an independent duty to develop the record in a social security disability hearing. The ALJ is not required, however, to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Goff, 421 F.3d at 791 (citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). While the Regulations provide that the ALJ should recontact a treating physician in some circumstances, "that requirement is not universal." Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006). Instead, the Regulations provide that the ALJ should recontact medical sources "[w]hen the evidence [received] from [the claimant's] treating physician or psychologist or other medical source is inadequate" for the ALJ to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1512(e), 416.912(e). When the ALJ is able to determine from the record whether the applicant is disabled, the treating physician need not be recontacted. Hacker, 459 F.3d at 938 (citing Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

In this case, the issue was not whether evidence received

from Dr. Lucas was somehow inadequate, unclear or incomplete. Instead, the ALJ found any opinion of disability to be refuted by other substantial evidence on the record as a whole. An ALJ is under no obligation to recontact the treating physician under such circumstances. Hacker, 459 F.3d at 938; Goff, 421 F.3d at 791.

B.   Credibility Determination

Plaintiff claims that the ALJ erred in his adverse credibility determination. Specifically, plaintiff argues that certain of the ALJ's credibility findings are contrary to the record and, further, that the ALJ improperly substituted his own opinion for that of medical professionals.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id.

Where, as here, a plaintiff contends on judicial review that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered

all of the evidence relevant to the plaintiff's complaints . . . under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. <u>Id.</u> at 738; <u>see also</u> <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  <u>Hogan</u>, 239 F.3d at 962; <u>see also</u> <u>Casey</u>, 503 F.3d at 696.  The determination of a claimant's credibility is for the Commissioner, and not the Court, to make.  <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005); <u>Pearsall</u>, 274 F.3d at 1218.

In this cause, the ALJ identified several inconsistencies in the record which detracted from plaintiff's credibility.  First, the ALJ noted that plaintiff's work record demonstrating significant work activity since her alleged onset date of disability, and most notably between July 2006 and March 2007, was inconsistent with her claim of a disabling condition.  <u>See</u> <u>Goff</u>, 421 F.3d at 792 ("Working generally demonstrates an ability to perform a substantial gainful activity."); <u>Comstock v. Chater</u>, 91 F.3d 1143, 1147 (8th Cir. 1996) (claimant's work activity during relevant period belied claim of disabling pain); <u>Starr v. Sullivan</u>, 981 F.2d 1006, 1008 n.3 (8th Cir. 1992) (claimant's work activity

considered in ALJ's credibility findings determinative of claimant's capacity to work during relevant period). The ALJ also noted the objective medical evidence to show only mild musculoskeletal conditions. See Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002) (in making credibility determination, ALJ may consider objective medical evidence which is contrary to claimant's assertions). The ALJ noted various prescriptions for narcotic pain medication but observed the pharmaceutical records not to support plaintiff's claim that she regularly exceeded the dosage of such medications due to pain. While the nature and strength of the medications prescribed for plaintiff would also tend to support her complaints of pain, see O'Donnell v. Barnhart, 318 F.3d 811, 817 (8th Cir. 2003), the Court must defer to the ALJ's findings if reasonable minds may disagree. Baker v. Apfel, 159 F.3d 1140, 1145 (8th Cir. 1998). The ALJ also noted that no treating or examining physician placed any specific limitations or long-term restrictions on plaintiff's activities. Lack of physical restrictions militates against a finding of total disability. Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999). The ALJ also noted there to be no documented side effects from any of plaintiff's medications and that any restrictions on plaintiff's daily activities appeared to be self-imposed rather than by any documented medical proscription. Indeed, the ALJ noted there not to be any documented evidence of nonexertional pain "seriously interfering with or diminishing the claimant's ability to concentrate or to get clerical jobs when she wants them." (Tr. 20.) See Comstock, 91 F.3d at 1147 (work

activity during relevant period belied subjective complaints of disabling pain); see also Goff, 421 F.3d at 792; Starr, 981 F.2d at 1008 n.3.

The ALJ further noted the evidence not to show plaintiff to have most of the signs of severe musculoskeletal pain, such as obvious muscle atrophy, persistent or frequently recurring muscle spasms, obvious or consistently reproducible neurological deficits or other signs of nerve root impingement, inflammatory signs, or bowel or bladder dysfunction. Although plaintiff claims this constitutes an improper substitution of the ALJ's opinion for medical impressions set out in the evidence, a review of the ALJ's decision shows him to have merely made a factual observation as to the lack of objective signs of debilitating musculoskeletal pain. It is well settled that an ALJ is not free to interpret the medical records by substituting his own judgment for the recorded impressions of a claimant's treating physicians. Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990). However, the ALJ did not do so here. Instead, the ALJ expressly considered the lack of medical signs which would reasonably be expected to produce the level of plaintiff's reported symptoms of musculoskeletal pain. Such consideration is expressly permitted by the Regulations and thus was not improper here. 20 C.F.R. §§ 404.1529(a), 416.929(a); see also Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (in determining claimant's credibility, ALJ properly considered that the signs of chronic and severe musculoskeletal pain were not present). Plaintiff also claims that this finding by the ALJ is in

fact contrary to the record inasmuch as there are documented findings as to plaintiff's limited range of motion, decreased sensory examinations, muscle spasms, and radiologic testing showing lumbar disk disease and shoulder tendinitis. In his written decision, however, the ALJ did not find that plaintiff did not exhibit any signs of musculoskeletal pain. Instead, the ALJ stated that:

> The claimant does not have *most* of the signs typically associated with chronic, severe musculoskeletal pain such as obvious muscle atrophy, *persistent or frequently recurring* muscle spasms, *obvious or consistently reproducible* neurological deficits (motor, sensory, or reflex loss) or other signs of nerve root impingement, inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction. The medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment.

(Tr. 20.) (Emphasis added.)

While the medical evidence does show plaintiff to have experienced some muscle spasming and limited range of motion during various examinations since her alleged onset date of disability,[27] the record shows, as found by the ALJ, that such objective signs were not persistent, frequently recurring, obvious, or consistently reproducible. Specifically, the record shows that while plaintiff exhibited muscle spasming in September 2004 and June 2005, there were no other objective reports of spasming and, indeed, there was

---

[27]The ALJ specifically set out the evidence of such objective signs in his decision. (<u>See</u> Tr. 17-18.)

a specific physical finding in April 2005 of no muscle spasms.  In
addition, while the record showed plaintiff to have exhibited
limited range of motion in April 2005, June 2005, September 2005,
and January 2007, there were multiple other examinations during
which plaintiff exhibited normal range of motion, and specifically
in September 2004, November 2005, January 2006, February 2006.
Finally, other than in June and November 2005 wherein plaintiff was
shown to have reduced grip strength, no physical examination since
plaintiff's alleged onset date of disability has shown plaintiff to
have exhibited reflex, motor or sensory deficits.  Accordingly, the
ALJ's finding relating to plaintiff's lack of persistent signs of
chronic and severe musculoskeletal pain is not contrary to, and
indeed is supported by, substantial evidence on the record as a
whole.  See Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987)
(question is not whether claimant suffers from pain, but whether
claimant's claim that pain prevents her from working is credible).

     A review of the ALJ's decision shows that, in a manner
consistent with and as required by Polaski, the ALJ considered
plaintiff's subjective complaints on the basis of the entire record
before him and set out numerous inconsistencies detracting from
plaintiff's credibility.   The ALJ may disbelieve subjective
complaints where there are inconsistencies on the record as a
whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).
Because the ALJ's determination not to credit plaintiff's
subjective complaints is supported by good reasons and substantial
evidence, this Court must defer to the ALJ's credibility

determination.  <u>Goff</u>, 421 F.3d at 793; <u>Vester v. Barnhart</u>, 416 F.3d 886, 889 (8th Cir. 2005); <u>Gulliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).

C.    <u>Vocational Exert Testimony</u>

Finally, plaintiff claims that the ALJ improperly relied on the testimony of the vocational expert in finding plaintiff not to be disabled inasmuch as the hypothetical question posed to the expert was flawed in its reliance on the opinion of the non-examining physician.

As discussed <u>supra</u> at Section V.A, the ALJ's determination of plaintiff's RFC was not based solely upon the opinion of Dr. Raabe as argued by plaintiff, but rather was properly based upon his examination of the entire record as a whole.  The ALJ did not err in considering the findings made by a non-examining physician as a factor in his RFC assessment.  Upon consideration of all of the evidence, the ALJ determined plaintiff's RFC and limitations not to preclude the performance of certain work activities and this determination is supported by substantial evidence on the record as a whole.  Because these limitations were supported by substantial evidence on the record as a whole, the hypothetical question posed to the vocational expert which included these limitations was not flawed.  <u>Tucker v. Barnhart</u>, 363 F.3d 781, 784 (8th Cir. 2004) (ALJ did not err in hypothetical question posed to vocational expert where he set out RFC which was supported by substantial evidence, and included only those impairments established by such evidence).

## VI. Conclusion

For the reasons set out above, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, the decision of the Commissioner denying plaintiff's claims for benefits should be affirmed.

Therefore,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **January 26, 2009.** Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).



UNITED STATES MAGISTRATE JUDGE


Dated this _13th_ day of January, 2009.